UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) CR-20-00634-DWL-1 |
| Plaintiff, | ) |
| | ) Phoenix, Arizona |
| vs. | ) August 3, 2020 |
| | ) 2:06 p.m. |
| Jill Marie Jones, | ) |
| | ) |
| Defendant. | ) |

_____)


 BEFORE:  THE HONORABLE DEBORAH M. FINE, MAGISTRATE JUDGE



TRANSCRIPT OF PROCEEDINGS

PRELIMINARY HEARING/DETENTION HEARING

APPEARANCES:

For the Government:
        U.S. Attorney's Office
        By: LISA JENNIS , ESQ.
        40 North Central Avenue, Suite 1800
        Phoenix, AZ  85004

For the Defendant Jill Marie Jones:
        Federal Public Defender's Office
        By: JAMI SUZANNE JOHNSON, ESQ.
        850 West Adams Street, Suite 201
        Phoenix, AZ  85007

Transcriptionist:
Barbara H. Stockford
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 39
Phoenix, Arizona  85003-2151
(602) 322-7247

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

1                          I N D E X

2                   PLAINTIFF'S WITNESSES

3    NAME                  DIRECT   CROSS  REDIRECT  RECROSS  VOIR DIRE

4    NICOLE ENGSTROM          5      21      27

5

6                      INDEX OF EXHIBITS

7    NO.        DESCRIPTION                             RECEIVED

8    1          Criminal complaint                         6

9    2          Copy of driver's licenses, bank card and   11
                receipt for Jill Marie Jones
10
     3          Copy of passport for Jill Marie Jones      11
11
     4          Copy of luggage receipt and photo of       9
12              matching luggage tag (American Airlines)

13   5          Copy of receipt from Walmart               18

14   6          Screenshot of prepaid Visa card            20

15   7          Turkish Airlines prepaid luggage receipt   15

16   8          Turkish Airlines records for flight        15
                booked for Jill Marie Jones to Istanbul,
17              Turkey

18   9          Jill Marie Jones' eVisa for the Republic   13
                of Turkey
19
     10         American Airlines itinerary for Jill       17
20              Marie Jones' flight to Detroit, Michigan

21

22

23

24

25

                UNITED STATES DISTRICT COURT

1          THE COURTROOM DEPUTY:  This is Case No. 2020-8217-MJ.

2     USA versus Jill Marie Jones.  This is the time set for a

3     continuation of the initial appearance as well as a detention

4     hearing and a preliminary hearing.

5          MS. JENNIS:  Good afternoon, Your Honor.  Lisa Jennis

6     for the United States, and I'm sitting here with FBI Task Force

7     Officer Nicole Engstrom.

8          THE COURT:  Good afternoon to you both.

9          MS. JOHNSON:  Good afternoon, Your Honor.

10    Jami Johnson for Jill Marie Jones who is not present but who is

11    appearing via video link from the jail where she is in custody.

12          THE COURT:  Good afternoon to you both.

13          Ms. Johnson, have you had an opportunity now to confer

14    with your client including about her appearance by video

15    teleconference, and does she consent?

16          MS. JOHNSON:  Yes, I was able to talk with Ms. Jones

17    last week.  I explained to her why we were doing video

18    conferences and she agreed to go forward with the video.

19          THE COURT:  Thank you.

20          Ma'am; is that correct?

21          THE DEFENDANT:  Yes, it is.

22          THE COURT:  Thank you.

23          Ms. Johnson, have you had an opportunity as well now

24    to review the complaint with your client such that you waive a

25    formal reading?

1    MS. JOHNSON:  I do.  I have and we do waive a formal

2    reading.

3    THE COURT:  Okay.  And just because of some things

4    I read in the Pretrial Services report, I know you would

5    bring it to my attention, but I just want to confirm, do you

6    believe that your client is competent to proceed?

7    MS. JOHNSON:  I do.

8    THE COURT:  Okay, thank you.

9    And this is the time then for the preliminary hearing

10   and detention hearing.  I don't think anything further is

11   required regarding the initial appearance.

12   Ms. Jennis, you may proceed.

13   MS. JENNIS:  Yes.  I have one witness,

14   Ms. Nicole Engstrom, that I talked about previously.  Where

15   would you like her to go?

16   THE COURTROOM DEPUTY:  There is a microphone set up

17   there, Your Honor.

18   THE COURT:  Oh, thank you.  Then she should take the

19   witness stand.  I'm going to move a little further here to give

20   her social distancing space.

21   THE COURTROOM DEPUTY:  If you can approach to be sworn

22   in.

23   (The witness, NICOLE ENGSTROM, duly sworn.)

24   THE COURT:  And you may examine from counsel table.

25   MS. JENNIS:  That was my question.  So thank you.

UNITED STATES DISTRICT COURT

Engstrom - Direct

```
 1              Before we begin, do you have the exhibits in front of
 2    you?
 3              THE WITNESS:  No, I do not.
 4              MS. JENNIS:  May she be provided with the original
 5    exhibits?
 6              THE COURTROOM DEPUTY:  Yes.
 7              THE COURT:  Thanks, Robert.
 8              Ms. Johnson, do you have a copy of all the exhibits?
 9              MS. JOHNSON:  I do.
10              THE COURT:  Thank you.
11              THE WITNESS:  Thank you.
12                          DIRECT EXAMINATION
13    BY MS. JENNIS
14    Q.  And could you, just for the record, please state your name?
15    A.  Yes.  My name is Nicole Engstrom.
16    Q.  And are you the same Nicole Engstrom who swore to the
17    complaint against Ms. Jill Jones on July 23rd, 2020?
18    A.  Yes.
19    Q.  And have you had the opportunity to review the complaint?
20    A.  Yes, I have.
21    Q.  And is it still accurate today?
22    A.  Yes, it is.
23    Q.  And prior to this hearing, did you have the opportunity to
24    review the 10 exhibits before you?
25    A.  Yes, I did.
```

Engstrom - Direct

1    Q.   Can you take a second and look at Exhibit No. 1?

2    A.   Yes.

3    Q.   And is Exhibit No. 1 the criminal complaint in this case,

4    20-8217?

5    A.   Yes, it is.

6              MS. JENNIS:  And I would move right now to admit that

7    exhibit, Your Honor.

8              THE COURT:  Any objection?

9              MS. JOHNSON:  No objection.

10             THE COURT:  Admitted.

11             (Exhibit No. 1 admitted into evidence.)

12   BY MS. JENNIS

13   Q.   Now, Officer Engstrom, were you present at Ms. Jones'

14   arrest on July 22nd, 2020?

15   A.   Yes, I was.

16   Q.   And can you tell us where the arrest took place?

17   A.   It occurred at the Phoenix Sky Harbor International Airport

18   in Terminal 4 near Gate A-1.

19   Q.   And approximately what time was it?

20   A.   Approximately 8:15 in the morning.

21   Q.   And where was Ms. Jones at that time?

22   A.   She was seated in a chair within a gate area of A-1 in the

23   terminal.

24   Q.   And where was the flight that was associated with that gate

25   going to that day?

7

1    A.   To Los Angeles International Airport.

2    Q.   Now, did the FBI have Ms. Jones under surveillance the

3    entire day on July 22nd?

4    A.   Yes.

5    Q.   And can you briefly describe what the FBI observed about

6    Ms. Jones on that day?

7    A.   Yes, she was observed coming out of her last known

8    residence and getting into a ride-share vehicle.  She had two

9    black backpacks with her and one teal or turquoise colored

10   suitcase.  That car traveled to a U.S. Bank where she went to

11   an ATM.  It then -- the car went to Phoenix Sky Harbor

12   International Airport to Terminal 4 to the departure dropoff.

13   Q.   What happened after she got -- first thing, was anyone with

14   her when she got dropped off?

15   A.   No.  She was alone.

16   Q.   Okay.  And what happened after she got off -- dropped off

17   at the departure area?

18   A.   She entered the Terminal 4 and went to the American

19   Airlines ticketing counter where she received a baggage for the

20   blue suitcase.  That baggage tag was affixed to the bag and she

21   gave that bag to American Airlines personnel.  From there, she

22   then went to the security gates and passed through security and

23   ultimately made it to Gate A-1 near the American Airlines

24   gates.

25   Q.   You talked about the suitcase that was checked.  You said

Engstrom - Direct

1   blue.  You mean like turquoise or teal?

2   A.  Yes.  Sorry.

3   Q.  So it's just one bag?

4   A.  One checked bag, yes.

5   Q.  And did you -- when -- after that bag was checked, did the

6   FBI get a chance to retrieve that bag?

7   A.  Yes.

8   Q.  Okay.  And when she was arrested, what did she have with

9   her?

10  A.  She had two black backpacks that were sitting down next to

11  her on the floor and then one cell phone in her hand.

12  Q.  Okay.  And after she was arrested, did you or anyone else

13  at the FBI have the opportunity to go through the luggage, the

14  backpacks, and the teal luggage that was checked?

15  A.  Yes.

16  Q.  And was there anything in or on the luggage that indicated

17  that she was getting on that flight to Los Angeles?

18  A.  Yes.  On the teal suitcase was the bag tag that I had

19  spoken about before.  It indicated her name of Jill Jones.  It

20  also had the flight number, Flight 3196.  And then in her

21  luggage -- sorry -- in her -- one of her backpacks, we found

22  the other end of that bag tag where the serial numbers matched

23  where it also showed her name and Flight No. 3196 leaving to

24  LAX.

25  Q.  So that bag tag and the receipt matched each other?

Engstrom - Direct

1    A.  Yes.

2    Q.  And can you take a look at Exhibit No. 4?

3    A.  Yes.

4    Q.  What is that?

5    A.  The front page is the part of the bag tag that we recovered

6    from one of her backpacks.  It says her name, Jill Marie Jones,

7    on it, the Flight No. 3196.  It also has some serial numbers on

8    it.  And then the second page is the bag tag that was affixed

9    to the teal suitcase with the matching serial numbers along

10   with the name Jill Marie Jones and Flight 3196 to LAX.

11          MS. JENNIS:  I'd like to move to admit Exhibit No. 4,

12   please.

13          THE COURT:  Any objection?

14          MS. JOHNSON:  No objection.

15          THE COURT:  So admitted.

16          (Exhibit No. 4 admitted into evidence.)

17   BY MS. JENNIS

18   Q.  So I believe you said you had the opportunity to go through

19   the backpacks.  Was there any identification in Ms. Jones'

20   backpacks?

21   A.  Yes.  We recovered two Arizona driver's licenses in her

22   name.  We also recovered her passports.  We recovered U.S.

23   debit card with her name on it as well and a receipt for the

24   ATM transaction that had occurred earlier that morning.

25   Q.  So you said something about two driver's licenses.  Do you

Engstrom - Direct

1   recall if there was a difference between the licenses?

2   A.  Yes.  One of them had her old address prior to her having

3   moved to Chandler, Arizona.  And the most recent driver's

4   license had her last known address that was in Chandler,

5   Arizona.

6   Q.  Could you take a look at Exhibit No. 2 and 3, please.  Do

7   you recognize Exhibit No. 2?

8   A.  Yes, I do.

9   Q.  What is it?

10  A.  These are photocopies of the two driver's licenses that

11  I spoke about, one with her old Phoenix address on it and one

12  with her last known Chandler address on it, and the backsides

13  of those driver's licenses.  It is also a U.S. Bank debit Visa

14  card that has her name, Jill M. Jones, on the front of it along

15  with the backside of that card and then the U.S. Bank receipt

16  from that morning on 7/22 of '20 showing an ATM withdrawal of

17  $200.

18  Q.  Could you take a look at Exhibit No. 3?

19  A.  Yes.

20  Q.  And could you tell the Court what that is?

21  A.  Yes.  This is her United States passports [verbatim] that

22  has her name on it, her date of birth, and a passport number.

23          MS. JENNIS:  At this time, I'd like to move to admit

24  Exhibits No. 2 and 3.

25          THE COURT:  Any objection?

UNITED STATES DISTRICT COURT

1          MS. JOHNSON:  No objection.

2          THE COURT:  So admitted.

3          (Exhibit No. 2 and 3 admitted into evidence.)

4   BY MS. JENNIS:

5   Q.  Now, just quickly looking at Exhibit No. 2, what are -- can

6   you identify the last four numbers of the U.S. Bank debit card?

7   A.  Yes.  They are 9775.

8   Q.  And does that match the receipt of 7/22/20 from U.S. Bank?

9   A.  Yes, it does.

10  Q.  Going back to the search of Ms. Jones' luggage on the --

11  that she had with her the day she was arrested, did you find

12  electronics in her backpacks?

13  A.  Yes, we did.

14  Q.  What type of electronics did you find?

15  A.  We found a laptop.  We also found a flash drive and then,

16  as I had stated before, she had her cell phone in her hand when

17  she was contacted by us.

18  Q.  And did the FBI have the opportunity to search any of this?

19  A.  Yes.

20  Q.  And when they searched the computer, did FBI find anything

21  on the computer indicating that Ms. Jones was traveling to

22  Turkey?

23  A.  Yes.

24  Q.  What did they find?

25  A.  We found an electronic visa that was issued in her name

1  from the Republic of Turkey.  It was issued to her on,

2  I believe, July the 6th of 2020 and it was valid until

3  January 1st of 2021.  And, on that visa, it had all of her

4  biographical information on it.

5  Q.  Can you take a look at Exhibit No. 9?

6  A.  Yes, ma'am.

7  Q.  Do you recognize that exhibit?

8  A.  Yes, I do.

9  Q.  What is it?

10 A.  It is a copy of the eVisa that was recovered from her

11 computer that has her name, her full name on it, her date of

12 birth, her passport number and, again, the date it was issued

13 and how long it was valid for.

14         MS. JENNIS:  At this time, I'd like to move to admit

15 Exhibit No. 9.

16         THE COURT:  Any objection?

17         MS. JOHNSON:  No objection.

18         THE COURT:  So admitted.

19         (Exhibit No. 9 admitted into evidence.)

20 BY MS. JENNIS

21 Q.  One thing I want to ask you about Exhibit No. 9 is:  Did

22 you check to see if the passport number matched the passport

23 that you had also located on her person?

24 A.  Yes, I verified that it was the same number.

25 Q.  And how about the date of birth?

Engstrom - Direct

1    A.   The date of birth is also the same number, same date of

2    birth.

3    Q.   And I believe you already mentioned that the eVisa is valid

4    from July 6th, 2020, through July 1st, 2021?

5    A.   Through January 1 of 2021.

6    Q.   Through January.   Thank you for the correction.

7         In the complaint, you stated that Ms. Jones booked

8    travel to Istanbul, Turkey, on or about July 13th, 2020.   That

9    was the day she booked it and then she was supposed to travel

10   on July 22nd, 2020, from Los Angeles International Airport.

11        Do you have any information that corroborates that

12   statement?

13   A.   Yes, I do.

14   Q.   What do you have?

15   A.   I was able to obtain information from Turkish Airlines that

16   corroborated that information that she had purchased a ticket

17   leaving LAX on July the 22nd, that she had purchased it on July

18   the 13th.   And, in that information from the airlines, it also

19   provided me with, again, her identifier such as her name, date

20   of birth, passport number along with the debit card that she

21   used to purchase that ticket with.

22   Q.   Can you take a look at Exhibits No. 7 and 8?   And, if you

23   take a look at them, can you let us know if you recognize them?

24   A.   I do recognize them.

25   Q.   And what are they?

UNITED STATES DISTRICT COURT

Engstrom - Direct

1   A.   Exhibit 7 is the information that I received directly from

2   Turkish Airlines.   Again, it shows flights, Turkish Airlines

3   Flight 10 on July the 22nd leaving from LAX.   It has her name

4   on it of Ms. Jill Jones and it identifies her date of birth and

5   her passport number on the first page.   Again, on the second

6   page, it shows her name.

7   Q.   I'm sorry to interrupt you.   There is just one page.   It

8   says "2" at the bottom.

9   A.   I'm sorry.   Are you speaking of the luggage receipt or --

10  Q.   Oh, I do apologize.   You were talking about Exhibit No. 8.

11  All right.   Let's go to Exhibit No. 8 and let's look at that

12  first.   Do you recognize that exhibit?

13  A.   Yes, ma'am.

14  Q.   Is this the receipt for a flight -- what is this receipt?

15  A.   It's the itinerary that Ms. Jones had booked for the

16  Turkish Airline flights on July 13th.

17  Q.   And taking a look at Exhibit No. 7.

18  A.   Yes, ma'am.   And this exhibit is a receipt provided to me

19  from Turkish Airlines for purchase of baggage as far as

20  checking in a piece of baggage.   It has her name on it and also

21  the method of payment that she used for that transaction.

22  Q.   And when you say "her," are you referring to

23  Ms. Jill Jones?

24  A.   Yes, I am.

25          MS. JENNIS:   Okay.   At this time, I'd like to move to

Engstrom - Direct

```
1    admit Exhibits 7 and 8.
2              THE COURT:  Any objection?
3              MS. JOHNSON:  No objection.
4              THE COURT:  So ordered.  Admitted.
5              (Exhibit Nos. 7 and 8 admitted into evidence.)
6    BY MS. JENNIS
7    Q.  So now we can talk about them a little bit.  On Exhibits 7
8    and 8, there are some highlighted areas, and that was areas
9    that -- where the highlighting was added later, correct?
10   A.  Correct.
11   Q.  And briefly discuss what the highlighted areas mean on
12   Exhibit No. 8.
13   A.  The first one toward the top indicates that she was a
14   no-show for the flight on July the 22nd out of LAX.  If you go
15   further down the page again, it identifies the flight number
16   that she was supposed to be on, Turkish Airlines Flight 10, on
17   July the 22nd from LAX.  It identifies her name as
18   Ms. Jill Jones.  It also identifies her date of birth and the
19   passport number that we know that she has.
20   Q.  Now, going to the second page of Exhibit No. 8 that says
21   "3" on the bottom.
22   A.  Yes, ma'am.  It also, again, identifies her by name.  It
23   also shows the date the ticket was issued on, which is July the
24   13th of 2020, and, at the bottom of that page, it shows her
25   partial U.S. debit card number that she used to purchase that
```

1   ticket with the last four numbers ending in 9775.

2   Q.   And that matches the U.S. Bank Visa that you seized from

3   her person on the day she was arrested.

4   A.   Yes.

5   Q.   And Exhibit No. 7, how does that relate to Exhibit No. 8?

6   A.   This is a secondary receipt for the baggage transaction.

7   Again, it identifies it belonging to Ms. Jill Jones.  It was

8   issued on July the 14th of 2020 through Turkish Airlines.  The

9   charge on that was $160.  Again, it also shows the partial U.S.

10   debit card number, with the last four ending in 9775, used to

11   conduct that transaction.

12   Q.   Going back to the complaint for a moment.  In Paragraph 23

13   of the complaint, you stated that Ms. Jones went to Michigan on

14   American Airlines on June 19th and returned to Phoenix on

15   June 22nd of 2020.

16          Did you find anything on Ms. Jones when she was

17   arrested to corroborate this statement?

18   A.   Yes.  When we searched her cell phone, we found a

19   screenshot with that information on there that showed the dates

20   and the flights from Phoenix to Detroit on June the 19th of

21   2020, and then the return flight from Detroit to Phoenix on

22   June the 22nd, 2020.

23   Q.   Can you take a look at Exhibit No. 10, please?

24   A.   Yes, ma'am.

25   Q.   What is Exhibit No. 10?

1    A.   This is a copy of that screenshot that we recovered from

2    her cell phone showing that same information that I had just

3    described.

4            MS. JENNIS:  I'd like to move to admit Exhibit No. 10.

5            THE COURT:  Any objection?

6            MS. JOHNSON:  No objection.

7            THE COURT:  Exhibit 10 is admitted.

8            (Exhibit No. 10 admitted into evidence.)

9    BY MS. JENNIS

10   Q.   Going back to the complaint again, in Paragraph 20 of the

11   complaint, you stated that, on or about May 25th, 2020,

12   Ms. Jones sent screenshots of a $500 Visa prepaid card that she

13   purchased at Walmart.  Were you able to obtain a receipt of

14   that purchase?

15   A.   Yes, I was.

16   Q.   And how did you do that?

17   A.   By contacting the store where the transaction occurred.

18   That store is located at 1175 South Arizona Avenue in Chandler,

19   Arizona.

20   Q.   Is that near the defendant's last known address?

21   A.   Yes, it is.

22   Q.   Can you take a look at Exhibit -- well, we'll just start

23   with Exhibit No. 5.

24   A.   Yes, ma'am.

25   Q.   And do you recognize that exhibit?

Engstrom - Direct

```
 1   A.  Yes.  It is the copy of the Walmart receipt.
 2           MS. JENNIS:  At this time, I'd like to move in
 3   Exhibit No. 5.
 4           THE COURT:  Any objection?
 5           MS. JOHNSON:  No objection.
 6           THE COURT:  Exhibit 5 is admitted.
 7           (Exhibit No. 5 admitted into evidence.)
 8   BY MS. JENNIS
 9   Q.  So Exhibit 5 also has some highlighted areas.  Could you
10   briefly explain what's highlighted to the Court?
11   A.  Yes.  The first thing highlighted at the top is the store
12   number, Store 2671, that corresponds to the address that I told
13   you prior.  Moving down this receipt, it shows that the
14   transaction was paid for by U.S. debit card with the last four
15   numbers of 9775 with an expiration date of 10/22.
16   Q.  I'm sorry to interrupt you, but does that match what you --
17   the card you seized from her?
18   A.  Yes, it does.
19   Q.  Thank you.
20   A.  It showed that there was a $500 debit load put on to that
21   prepaid card and that the last four digits of the account
22   number for the actual prepaid card itself, 5075.  It shows that
23   transaction was done on 5/25 of 2020.
24   Q.  And why do you believe that the person who purchased the
25   $500 prepay is -- and this is what was in Paragraph 20 of the
```

Engstrom - Direct

1   complaint -- is the person you arrested on July 22nd?

2   A.  Again, the last four digits of the U.S. debit card that

3   were used for that transaction, to purchase that card, the

4   Visa -- I'm sorry, the Walmart prepaid card -- matched the U.S.

5   debit card that we know and recovered from Ms. Jones on the

6   date that she was arrested.

7   Q.  Take a look at Exhibit No. 6.  Once you get it out, please

8   let -- tell me if you recognize that exhibit.

9   A.  Yes, I do.

10  Q.  And what is it?

11  A.  These are the screenshots of the Walmart Visa prepaid card

12  that I referred to in the complaint.

13  Q.  So that you referred to in Paragraph 20 of the complaint?

14  A.  Yes, ma'am.

15  Q.  And this were the screenshots that she sent to the person

16  she believed to be with Al Qaeda?

17  A.  Yes, ma'am.

18  Q.  And how do you know --

19          Well, before we go forward on that, I would ask that

20  Exhibit No. 6 be admitted.

21          THE COURT:  Any objection?

22          MS. JOHNSON:  No objection.

23          THE COURT:  Exhibit 6 is admitted.

24          (Exhibit No. 6 admitted into evidence.)

25

Engstrom - Cross

BY MS. JENNIS

Q.  How do you know that Exhibit No. 6 was purchased -- you

know, that gift card matches the receipt in Exhibit No. 5?

A.  The last four digits on the back of that -- there are a

series of numbers on the back of that card.  The last four

digits that are highlighted toward the right edge of the card,

the 5075, those are the last four of the account number for

that specific card, and those match the last four digits that

are on the receipt from that day.

Q.  And that's a unique number, correct?

A.  Yes.

Q.  And in -- in Exhibit No. 6, you're talking about the second

picture right under the bar code?

A.  Yes.

Q.  Because it's not that easy to see.

A.  No, it's not.

            MS. JENNIS:  Okay.  I have no further questions,

Your Honor.

            THE COURT:  Thank you.

            Ms. Johnson, you may cross from your seat.

            MS. JOHNSON:  Thank you.

                        CROSS-EXAMINATION

BY MS. JOHNSON

Q.  Ms. Engstrom, you were involved in the arrest of Ms. Jones

on July 22nd; is that correct?

UNITED STATES DISTRICT COURT

Engstrom - Cross

```
1    A.  Yes, ma'am.

2    Q.  Did you have involvement in this case prior to July 22nd?

3    A.  Yes, ma'am.

4    Q.  Have you authored any reports about any of your activities

5    in this case prior to July 22nd?

6    A.  No, ma'am.

7    Q.  Are you -- the complaint cites numerous communications

8    Ms. Jones allegedly had with undercover government agents,

9    right?

10   A.  Yes, ma'am.

11   Q.  Have you reviewed those communications personally?

12   A.  Yes, I have.

13   Q.  So you're familiar with Ms. Jones' alleged communications

14   with the individuals identified in the complaint as OCE 1 and

15   OCE 2?

16   A.  Yes.

17   Q.  And these are employees of the United States, yes?

18   A.  Yes.

19   Q.  They are not members of Al Qaeda or members of any

20   terrorist organization?

21   A.  No.

22   Q.  When Ms. Jones was arrested at the airport on July 22nd,

23   there was no indication that the communications which you

24   allege were made by Ms. Jones -- that whoever was having these

25   communications was aware that the person that they were
```

1   speaking to was a law enforcement person, right?

2   A.   Can you repeat the question?  I'm sorry.  I don't

3   understand what you're saying.

4   Q.   Yes.  So the communications that you are alleging were made

5   by Ms. Jones, whoever it was who was having these conversations

6   with the agents, there was no indication that the person having

7   the conversations was aware that they were speaking with

8   agents, correct?

9   A.   No.

10  Q.   Okay.  So Ms. Jones was arrested at the airport.  There was

11  no indication that Ms. Jones was trying to leave the United

12  States to avoid being arrested, right?

13  A.   Correct.

14  Q.   The passport that Ms. Jones had in her possession was

15  issued in 2017; is that right?

16  A.   Yes.

17  Q.   And that predates Ms. Jones' communicating in any way about

18  topics related to Islam or terrorism; is that right?

19  A.   I can only speak to my involvement with her at the

20  beginning of this case.  I can't speak to what may have been

21  occurring in 2017.

22  Q.   You're not aware that Ms. Jones wasn't even Muslim in 2017?

23  A.   I was aware, but I don't know what communications she was

24  having.

25  Q.   The individual who was having these communications, who the

Engstrom - Cross

```
 1    government alleges is Ms. Jones, had expressed to one of these
 2    agents an interest in going to Turkey and joining up or
 3    becoming involved with or connected with an organization -- I'm
 4    not even going to -- I'm going to butcher the pronouncement --
 5    Tanzim Hurras al-Din.  Is that right?
 6              MS. JENNIS:  Objection.  Outside the scope of direct.
 7              THE COURT:  Overruled.
 8              THE WITNESS:  Can you repeat the question, please?
 9    BY MS. JOHNSON
10    Q.  Yes.  So the individual who was having these
11    communications, who I understand you believe to be Ms. Jones,
12    had expressed an interest in leaving the country and
13    potentially meeting up with a group identified as Tanzim Hurras
14    al-Din; is that right?
15    A.  Correct.
16    Q.  That is not a terrorist organization under Section 219 of
17    the Immigration and Nationality Act, right?
18    A.  Correct.
19    Q.  When Ms. Jones was arrested, she didn't have any guns on
20    her, right?
21    A.  Correct.
22    Q.  And she doesn't have any criminal history.  She's allowed
23    to own guns if she wants, right?
24    A.  Correct.
25    Q.  She didn't have any -- any weapons of any sort on her?
```

1    A.   No.

2    Q.   There's no indication from your investigation that she had

3    ever attempted to acquire any of these things?

4    A.   No.

5    Q.   She went with law enforcement when she was arrested

6    willingly?  Well, she was under arrest.  But she didn't put up

7    a fight?  She didn't try to resist, right?

8    A.   No, she didn't.

9    Q.   There was no violence involved?

10   A.   No.

11   Q.   She didn't make any threats?

12   A.   No.

13   Q.   She was compliant and cooperative with officer commands?

14   A.   Yes.

15   Q.   The visa that Ms. Jones had for Turkey, it was a temporary

16   stay visa -- right? --  90 days?

17   A.   Yes, ma'am.

18   Q.   It was not a residential visa?

19   A.   No.

20   Q.   You made reference to -- there was a receipt from an ATM

21   withdrawal that's in the exhibits.  Do you recall that?

22   A.   Yes, ma'am.

23   Q.   Ms. Jones withdrew -- the receipt appeared to indicate that

24   Ms. Jones withdrew $200 that day; is that right?

25   A.   Yes, ma'am.

1    Q.   That was not the entire contents of that account, right?

2    A.   I do not know for that day.  I just have that receipt for

3    that day that showed the withdrawal and then the remaining

4    balance.

5    Q.   And there was a remaining balance of a few hundred dollars,

6    right?

7    A.   Yes.  Yes, ma'am.

8    Q.   So, in connection with your involvement with this case, you

9    reviewed many social media communications with an individual

10   who you believed or communications that you believe were made

11   by Ms. Jones, fair?

12   A.   Yes.

13   Q.   Many of those communications or a frequent topic of

14   conversation in those communications was -- was the coronavirus

15   epidemic, right?

16   A.   Yes.

17   Q.   And the individual who you believed to be Ms. Jones made

18   numerous comments about being concerned about the way the

19   United States was dealing with the coronavirus crisis, yes?

20   A.   Yes.

21   Q.   In particular in the state of Arizona, yes?

22   A.   Yes.

23   Q.   Okay.  The epidemic was quite bad and that it felt quite

24   dangerous to be here because it was -- the epidemic was

25   spiraling out of control, right?

1        MS. JENNIS:  Objection, Your Honor.  Again, outside

2   the scope.

3        THE COURT:  Overruled.

4        THE WITNESS:  I'm sorry.  Can you repeat the question?

5   BY MS. JOHNSON

6   Q.  There were numerous communications expressing a belief that

7   it was not -- that the public health situation in Arizona was

8   not safe because the government was not doing enough to bring

9   the coronavirus epidemic under control?

10  A.  Correct.

11  Q.  It is your belief that Ms. Jones, when she was at the

12  airport, believed she was going to LA -- first to LA where she

13  was going to meet up with one of these people who was actually

14  an undercover agent; is that right?

15  A.  Correct.

16  Q.  And the idea of this agent in -- wherever that person is

17  located -- is the individual who, in communicating with the

18  accounts that you believe belong to Ms. Jones, who first raised

19  the idea of possibly leaving the United States; is that right?

20  A.  Can you rephrase the question?

21  Q.  Yes.  So you believe that Ms. Jones was communicating with

22  this person who is an FBI agent -- right? -- the one who was

23  supposedly in LA, right?

24  A.  Correct.

25  Q.  The -- the first mention of leaving the United States was

1  made by the FBI agent; is that right?

2  A.  I don't recall.  I can't, at this time, speak on that.

3          MS. JOHNSON:  Okay.  Those are all the questions that

4  I have.

5          THE COURT:  Thank you.  Any redirect?

6          MS. JENNIS:  Yes, Your Honor.

7                      REDIRECT EXAMINATION

8  BY MS. JENNIS

9  Q.  Did the FBI -- you were asked about whether it was a

10  temporary stay in Turkey, correct?

11  A.  Yes.

12  Q.  And did the FBI go to the defendant's last known address

13  and ask them about whether she was returning to that address?

14  A.  Yes.

15  Q.  And what happened?

16  A.  They identified that Ms. Jones was no longer going to be

17  working for them and that she was flying to another state to

18  obtain another job.

19  Q.  And you were also asked -- wait.  One more question.

20          Were there any of the defendant's things left at that

21  location?

22  A.  Just a couple of minor things, but nothing that -- of any

23  note.

24  Q.  When you say "minor things," what do you mean?

25  A.  She had left part of a computer without a hard drive in it.

1   She gave that away to a friend of the family that lived in that

2   house.  And I believe that there was a box that had been

3   shipped to her with no contents in it.  But she didn't have any

4   clothing left there, no personal items that belonged to her at

5   that point in time.

6   Q.  And you were asked several questions about the coronavirus.

7   Was there any medications in the luggage that you found?

8   A.  I do not recall.

9   Q.  And are you aware of whether the defendant has any health

10  issues?

11  A.  I believe she has a knee injury, but, other than that, not

12  that I am aware of.

13  Q.  You were also asked about any weapons.  And in the

14  complaint, in Paragraph 18 -- it's Exhibit No. 1 if you want to

15  take a look at that -- there's a quote in that paragraph

16  about -- by the defendant.  And what does the defendant say

17  she'll do if she can't leave America?

18  A.  She indicated that, if she had no other way to do what she

19  wanted to do, that she would not hesitate to act and conduct an

20  attack here in the United States.

21  Q.  And also can you take a look at Paragraph 13?

22  A.  Yes, ma'am.

23  Q.  And you were asked a question about who brought up the

24  subject of either leaving the country or joining Al Qaeda.

25  I don't remember the exact question.  Does that refresh your

Engstrom - Redirect

```
 1   recollection?

 2   A.  Yes.

 3   Q.  And what is your understanding?

 4   A.  Ms. Jones had made a comment to one of the OCEs that, at

 5   least one time prior, she had a chance to leave the United

 6   States, but it became too risky and she did not want to be

 7   kidnapped.

 8            MS. JENNIS:  I have no further questions, Your Honor.

 9   Thank you.

10            THE COURT:  Thank you.

11            You may be excused from the witness stand.

12            THE WITNESS:  Thank you, Your Honor.

13            (Witness excused.)

14            THE COURT:  Does the government have any other

15   evidence or proffer?

16            MS. JENNIS:  No, Your Honor.

17            THE COURT:  Thank you.

18            Does the defense -- we'll do argument after evidence.

19   Is there any other -- is there any evidence or proffer that the

20   defense would like to make?

21            MS. JOHNSON:  No, Your Honor.

22            THE COURT:  Okay, thank you.  Then we'll go to

23   argument on both the preliminary hearing and detention hearing.

24            Ms. Jennis, my first question is:  Given the charge,

25   is it the government's position that I can consider detention
```

UNITED STATES DISTRICT COURT

```
1    on danger as well as flight risk?
2            MS. JENNIS:  Yes, Your Honor.  It is also a
3    presumption case.
4            THE COURT:  And tell me the basis of it being a
5    presumption case.
6            MS. JENNIS:  Yes, Your Honor.  Under Section 31 --
7    sorry -- I just wrote it all down.  Let's see.  3142(e)(3)(C),
8    it says, subject to rebuttal by the person, it's presumed that
9    no condition or combination of conditions will reasonably
10   assure the appearance and the safety of the community, and then
11   it goes down:  any offense listed in 2332b(g)(5)(B).  And so,
12   if you go to that Section 2332b(g)(5) big (B), it's a very long
13   list, but if you go to the very end of the list, you'll see
14   that Section 2339b relating to providing material support to
15   terrorist organizations is listed there.
16           THE COURT:  Thank you.  And you may proceed with any
17   other argument that you have.
18           MS. JENNIS:  Do you want me to remain seated,
19   Your Honor?
20           THE COURT:  However you're comfortable.
21           MS. JENNIS:  So, as Your Honor is well aware, there
22   are certain things that the magistrate judge can consider when
23   deciding whether there are conditions for release or a
24   combination of conditions:  first, the nature of the crime.
25   This is a federal crime of terrorism, Your Honor, and, as you
```

1   probably heard just a little bit even, the weight of the

2   evidence is strong.  The history and characteristics of the

3   defendant, she admittedly has very little if not no money.

4   History of mental instability.  She has no ties to Phoenix, to

5   the community.  She has no employment, nowhere to live.  I know

6   that her father was reinterviewed -- was interviewed and was

7   contacted, which is different than the initial interview, and

8   he said he was estranged from his daughter.  She has a prior

9   history of substance abuse and, according to the defendant, she

10  said she has a large amount of debt.

11          It is believed that she is a serious danger to the

12  community.  She is dangerous.  As we just went over in

13  Paragraph 18, she just showed she will -- she will act if she

14  can't leave the country, and also her willingness to die for

15  her beliefs.

16          Now she supports terrorism and, as you can see from

17  the complaint, that she was going to be a recruiter, an online

18  recruiter.  So she doesn't actually have to go meet people.

19  She -- to recruit for Al Qaeda, right?  She can just do

20  everything online.  So if she was to be released, she would

21  have -- it would be very difficult to keep her from all online

22  communications even if she had a place to go or a job or

23  anything like that.

24          She has admitted that she has a history of

25  homelessness and I think it would be next to impossible to keep

1   her from a phone.  It's not even just a computer.  It would be

2   a phone, a computer, any type of electronic device that could

3   be connected to the internet.  Also, what's of very concern to

4   the United States is, in her initial interview with Pretrial

5   Services, she said that she was going, I believe, to Iowa or to

6   Detroit to the Pretrial Services officer.

7          Bear with me for a moment.

8          THE COURT:  It's on Page 2, second paragraph, that

9   current attempt to move to Iowa or Michigan.

10         MS. JENNIS:  Yes, thank you.  In that first sentence.

11  And she was not going there.  So it's believed that she was not

12  straightforward with the Pretrial Services officer and she, you

13  know, was clearly going to Los Angeles and then on to Turkey.

14         So due to that information and some other mental

15  health issues listed in the Pretrial Services report and the

16  fact that only some of her information has been verified, I

17  haven't heard the other side say anything, but I think it would

18  be very hard to rebut the presumption of detention.

19         As for preliminary hearing and probable cause that the

20  person in the complaint is the person we arrested, there is

21  much information to be considered there.  I think that the

22  witness has, along with the exhibits, clearly demonstrate that

23  the person in the complaint is the person who is in custody.

24         The items seized -- these many items seized from the

25  defendant along with the items follow up:  receipt from

```
 1    Walmart; the Turkish Airlines items; again, the items on her
 2    that were found on her electronics; the eVisa; the American
 3    Airlines itinerary along with the luggage receipts; the
 4    passport; the driver's license.  Everything matches and
 5    corresponds to the allegations in the complaint.  So everything
 6    matches up that it's the same person and that $500 had been
 7    provided to Al Qaeda and has demonstrated that it was the
 8    defendant who provided that money that is the basis of that --
 9    of the charge.  And, therefore, there's probable cause to
10    believe that the person who was arrested and who is here on the
11    video screen is, in fact, the person who met -- is -- the
12    person who committed the acts alleged in the complaint.
13              THE COURT:  And you meant, I think, "believed to be
14    provided to Al Qaeda," but that was actually provided to the
15    agent.
16              MS. JENNIS:  Yes, ma'am.
17              THE COURT:  Thank you.
18              Ms. Johnson?
19              MS. JOHNSON:  Yes, Your Honor.
20              We believe that Ms. Jones has met her burden of
21    rebutting the presumption of detention in this case.  Ms. Jones
22    has no criminal history whatsoever.  She is not currently
23    employed, but she has worked in the past.  She is employable.
24    She -- there's no indication that she has ever attempted to
25    acquire a weapon or any sort of explosive device here in the
```

UNITED STATES DISTRICT COURT

1    United States.  She would not object to a condition barring her

2    from accessing the internet, no phones, no computers.  She does

3    have -- she doesn't have a lot of money, but she does have a

4    bank account.  She has some money left in her bank account and,

5    you know, and the ability to go to work and support herself.

6            There is -- we understand the allegations in the

7    complaint are quite serious, but, you know, the entirety of the

8    activity cited in this complaint appears to date from the last

9    couple of months during the coronavirus epidemic, and there's

10   just not a long pattern of Ms. Jones being a problem or being

11   uncooperative.  She was cooperative when she was arrested.  She

12   did not -- there's no indication in her past that she is unable

13   to follow rules.  She has lived in the United States her entire

14   life.  She has no history of foreign travel.

15           I disagree with the prosecutor that the statement to

16   Pretrial that she was intending to relocate to Iowa or Michigan

17   shows deception.  I think it's entirely consistent with the

18   fact that she had a limited-time-period visa to visit Turkey.

19   I think it's consistent with somebody who was going to go

20   overseas for a while with somebody who she thought was a friend

21   and then return to the United States and take up residence in

22   Iowa or Michigan and look for another job.

23           There is -- we don't dispute that she was arrested at

24   the airport as the agent noted.  There's nothing that was

25   indicating that she was at the airport because she was

UNITED STATES DISTRICT COURT

1   attempting to flee from law enforcement.  She was going to --
2   you know, the agents there -- she was going to LAX where she
3   was going to meet up with somebody and they were going to go to
4   Turkey and she had some interest in communicating possibly with
5   some people overseas who are expressly not a foreign terrorist
6   organization as designated under the Immigration and
7   Nationality Act.
8           So we think that Ms. Jones is -- can be supervised and
9   should be given the opportunity to return to the community.
10  She is happy to wear an ankle monitor and to submit to all
11  rules including, you know, drug testing and no internet access.
12          With respect to the issue of probable cause, the
13  government has submitted no evidence whatsoever that Ms. Jones
14  understood the organization or the person with whom she was
15  communicating who was a federal agent, OCE 2 -- that Ms. Jones
16  understood that this person was affiliated with the same
17  organization that is designated under the Immigration and
18  Nationality Act as a terrorist organization.  So the complaint
19  says that Al Qaeda was designated a foreign terrorist
20  organization under Section 219 of the Immigration and
21  Nationality Act, and on October 8th, 1999.  That's 21 years
22  ago.
23          "Al Qaeda" is a term that has expanded to the point
24  where it's almost devoid of all meaning.  And there's no
25  indication from the complaint that Ms. Jones understood, if we

UNITED STATES DISTRICT COURT

1    accept as true the allegations -- which we do not, but, for the

2    purposes of this hearing, we will accept as true what is

3    written in the complaint.  There is no indication in the

4    complaint that Ms. Jones understood that $500 to be going to

5    help this organization that was designated 21 years ago as a

6    foreign terrorist organization, that she knew where this person

7    was and that Al Qaeda was something that existed.  I think that

8    there's references to Afghanistan.  There's no evidence that's

9    been submitted that Afghanistan had an Al Qaeda organization in

10   1991.  There's just no -- there's not enough evidence linking

11   the foreign terrorist organization identified in the

12   Immigration and Nationality Act to the organization that the

13   government alleges Ms. Jones thought she was assisting.  So we

14   do not think that the government has met its burden with

15   respect to probable cause.

16           Ms. Jones has -- Ms. Jones' driver's license is in

17   evidence.  The Court can take notice of the fact that

18   Ms. Jones -- Ms. Jones' weight would appear to place her within

19   the high-risk category for contracting COVID-19 or for having a

20   particularly serious case of COVID-19 were she to fall ill.  As

21   the Court is aware, more than 300 people have tested positive

22   for COVID at the facility where Ms. Jones is being held with an

23   83 percent test rate that is almost certain to be a dramatic

24   undercount of the actual prevalence of the disease there.  An

25   inmate has already died.  There are two in the hospital as of

1    today.  Ms. Jones should be allowed to reside in the community

2    where she can isolate herself effectively and be safer both to

3    herself and to other people confined at the facility.

4              THE COURT:  Thank you.

5              Ms. Jennis?

6              MS. JENNIS:  Yes, Your Honor.  I think it's pretty

7    clear in the complaint that Ms. Jones knew the money was --

8    well, one, that she wasn't going to come back.  Paragraph 15

9    says she said she did not want to stay in America.

10   Paragraph 14 said, "I'd rather go and support those that do

11   what is right and die trying to get there or while I'm there

12   than live in ease here."

13             She actually intended to go to Afghanistan.  She was

14   originally flying to Tajikistan, but then the airport in

15   Dushanbe, which is the -- I believe the capital of Tajikistan,

16   closed and she couldn't get there.  So she wanted to go help

17   wherever, you know, she could help.

18             And so, in Paragraph 16, she was asked directly if she

19   supported Al Qaeda and their struggle against the kufr -- you

20   know, the people who don't believe in what the -- the same

21   things that Ms. Jones believes in -- and she said she does

22   support Al Qaeda.

23             Paragraph 17, she asks -- you know, she talks about

24   how she could help Al Qaeda.  And then, in Paragraph 18, we've

25   already discussed how she would act here.  She would kill

1    Americans.  And then, at the end of Paragraph 18, she knows

2    that the money will be used to buy weapons to kill Americans.

3    And she knows what she is doing is wrong.  She realizes that it

4    could be a trap, but she has stimulus money from coronavirus;

5    so she decides to send that money.

6            In Paragraph 19, she says that she knows the money is

7    for snipers who need scopes for rifles as the American patrols

8    are far away and it will keep the snipers -- the snipers can

9    stay at a distance and keep them safe when they kill the

10   American soldiers.  And it goes on.  In fact, in Paragraph 21

11   it talks about a picture of a rifle that she was sent with a

12   scope on it and that was purchased with the $500 she had sent,

13   and she felt bad.  She wished she had more to give.

14           And it just goes -- goes on and on about how she knows

15   she is going to go -- that the money went to Al Qaeda.  I mean,

16   she got a picture of it.  I mean, she got a picture of the

17   scope on the rifle.  And she specifically told she just wishes

18   she could have sent more money.  And it's after that when

19   Dushanbe airport closes that she is just willing to go anywhere

20   to help Al Qaeda.  And then she decides to go to Syria.  And

21   Turkey is on the border of Syria, but you can't fly into Syria.

22   So she could only get a visa to go to Turkey and then was going

23   to go get to Syria another way, Your Honor.

24           So I believe that that is certainly probable cause to

25   show -- there's many other references to Al Qaeda in the

```
1    complaint, as your Honor knows, but that shows that she knew
2    what the money was going for and why she was traveling -- and,
3    clearly, she was recruiting.  I mean, she says the exact words:
4    "I'm going to recruit for Al Qaeda" -- that she knew what she
5    was doing.
6              THE COURT:  Thank you.
7              I've considered the evidence presented and the
8    arguments and I find that there is probable cause for the
9    charge in the complaint to proceed and the defendant is ordered
10   to answer for further proceedings thereon.
11             The government has connected Ms. Jones clearly to the
12   activities that are outlined and the statements that are
13   outlined in the complaint and affidavit, including by the
14   connection of the debit card, purchase of the Visa prepaid gift
15   card.
16             And I also find -- considered the argument regarding
17   Al Qaeda and the defense argument that it is -- should be
18   considered in a broader sense, but when you actually look at
19   Ms. Jones' statements and her particular actions here as
20   described in the affidavit and highlighted by Ms. Jennis, it's
21   clear that Ms. Jones intended that $500 to go to Al Qaeda for
22   purposes of financing weapons that would be used in terrorist
23   acts against Americans, particularly American soldiers.  So
24   there is probable cause for the complaint to proceed.
25             I find this is a presumption case under the Bail
```

UNITED STATES DISTRICT COURT

1    Reform Act.  That means that this is in the small class of

2    cases where I am to presume, assume the defendant is a risk of

3    nonappearance, a flight risk, and to presume the defendant is a

4    danger and that there are not conditions I could set that would

5    reasonably assure the defendant's appearance at further court

6    proceedings and to presume that there are not conditions that

7    I could set that would protect the community from the

8    defendant.

9          In the Ninth Circuit, the presumption can be rebutted

10   by information in the Pretrial Services report.  Even if their

11   presumption is rebutted, the presumption remains as one of the

12   factors for the Court to consider including the other

13   delineated factors under the Bail Reform Act such as the nature

14   and circumstances of the alleged offense; the nature and the

15   seriousness of the danger of others and to the community; the

16   weight of the evidence against the defendant, and the weight of

17   the evidence in the Ninth Circuit is the least important

18   factor; the history and characteristics of the defendant

19   including the defendant's physical and mental condition, family

20   ties, employment, length of residence in the community,

21   community ties, past conduct, criminal record, history of drug

22   and alcohol abuse, record of appearance at prior court

23   proceedings and whether the defendant was on conditional

24   release in another case at the time of the alleged events.

25   I've considered the Pretrial Services report and the supplement

1    after Pretrial Services spoke to the defendant's father.

2            I note that, in the supplement, Pretrial Services

3    recommends that the defendant be detained pending a screening

4    for placement at Crossroads halfway house.  The Pretrial

5    Services recommendation is not binding on the Court.

6    I consider it.  And when I look at the information in the

7    Pretrial Services report, the actual information, that there

8    hasn't been any correction or substantial correction to any of

9    it; so I adopt that information.

10           In viewing this, regarding flight, it is -- and

11   danger, to the defendant's credit, she has no criminal record,

12   and that is significant.  She is 35 years old.

13           Given the remainder of the information here, is that

14   enough to rebut the presumption?  Here, on flight first,

15   regarding ties, she does not have any remaining ties to

16   Arizona.  Yes, she had two Arizona driver's licenses with

17   addresses that she is no longer connected with as she was

18   trying to leave the country when she was arrested, but it's not

19   only her statements that are highlighted in the complaint.

20   She's quit her job.  She's given away her -- or has very few

21   possessions.  She says she is going to attempt to move to Iowa

22   or Michigan, but yet she has, instead, over a period of time,

23   made plans to travel to a foreign country and then took steps

24   over a period of time to execute that plan.  Had she not been

25   arrested, she would have continued on her travels.

1           And so I'm to look at ties to the district, to

2   Arizona.  But here I find it significant that, really,

3   Ms. Jones -- and, sadly, doesn't appear to have significant

4   financial ties in the United States other than significant

5   debt.  She has no long-term employment.  She's has had some

6   employment, to her credit.  She doesn't have any close ties to

7   family.  She describes essentially being estranged and that was

8   confirmed when her father was contacted.  So no -- no

9   employment ties, no significant ties to family and no residence

10  here.  She was homeless at the time of her arrest for a very

11  short time having intended to leave the United States.

12          She certainly has no remaining ties in Arizona.  It is

13  even indeterminate based on what she reported to Pretrial

14  Services of how long she had been in Arizona.  She was born in

15  Iowa.  She reported she was raised in Iowa.  She had previously

16  resided in the states of Wisconsin and Ohio.  Her plans to move

17  were indeterminate.  Even her stated plans to Iowa or

18  Michigan -- according to the evidence, she had been to Detroit

19  for a full weekend with travel on both sides of it, or at least

20  the equivalent timewise, and she had no more particulars to

21  report to Pretrial Services.  Yes, she's had some employment in

22  Arizona, but no ties here.

23          And when you look at her lifestyle, it's not stable

24  over the years.  She has had periods of homelessness between

25  various live-in work positions.  Her mental health plays a

1    factor here as recounted in the Pretrial Services report and

2    her father's concerns.  This is someone who -- who lacks ties

3    to Arizona and great intent to leave the country for an

4    indeterminate period, perhaps to not return at all based on her

5    own statements, and I'm struggling to find anything that would

6    keep her to the United States.

7          So, under those circumstances, is her lack of criminal

8    record enough to rebut the presumption?  No.  I find she has

9    not rebutted the presumption.  But, alternatively, I find that

10   the government has shown by a preponderance of the evidence

11   that she is a flight risk.  And I've considered placing her at

12   Crossroads if she is accepted for placement there after

13   screening.  I've considered electronic monitoring and other

14   less restrictive alternatives.  Even with very restrictive

15   conditions, I have no faith, based on this record, that

16   Ms. Jones would abide by the conditions and stay in -- where

17   she was ordered to reside.

18         So flight risk, not rebutted the presumption,

19   preponderance, and alternative, and there are not conditions

20   I could set that would reasonably assure her appearance.

21         Moving on to danger, again, is her lack of criminal

22   record enough to rebut the presumption?  Given her statements

23   here and her clear knowledge that that $500 -- her belief, not

24   real knowledge, because, thankfully, it was to undercover

25   agents and not actually to Al-Qaeda operatives -- she fully

1     believed that that $500 was going to buy weapons that would be

2     used against American soldiers.  That alone, for me, does not

3     make her lack of a criminal record enough to rebut the

4     presumption.  I find she has not rebutted the presumption that

5     she is a danger.  Alternatively, by clear and convincing

6     evidence, she is a danger and there are not conditions that

7     I could set that would reasonably protect the community in part

8     because I don't think she will stay put, but, also, even if she

9     were to appear to be following conditions including very

10    restrictive ones regarding the internet and that it's almost

11    impossible to monitor, in modern circumstances when people are

12    living in a group situation such as Crossroads, that she is not

13    using someone else's phone.  This is a common thing that people

14    lend each other their phones when they're, you know, in classes

15    together or living in proximity, to make phone calls, to go on

16    the internet because almost everything in our lives in this day

17    and age requires the use of a cell phone.  And so there are not

18    conditions that I could set that would reasonably protect the

19    community.

20         In the end, I must take Ms. Jones by her words as she

21    conveyed them to the undercover officer.  And she is a danger.

22    She'll be detained pending further proceedings.

23         Is there anything further from the government?

24         MS. JENNIS:  No, I don't believe so, Your Honor.

25         THE COURT:  From the defense?

UNITED STATES DISTRICT COURT

1          MS. JOHNSON:  No, Your Honor.

2          THE COURT:  Thank you.  The government is ordered to

3    retain the exhibits pending the remainder of the case, and

4    we're adjourned on this proceeding.  Thank you.

5          MS. JENNIS:  Thank you.

6              (Proceedings adjourned at 3:15 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1

**C E R T I F I C A T E**

2

3        I, BARBARA H. STOCKFORD, court-approved transcriber,

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8        DATED at Phoenix, Arizona, this 2nd day of March 2021.

9

10                                    s/Barbara H. Stockford

11                                   Barbara H. Stockford

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT